UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

VERSUS

MARCUS HARRIS

CRIMINAL ACTION

NO. 15-15-JJB-RLB

**RULING ON MOTION TO SUPPRESS**

This matter is before the Court on the Defendant Marcus Harris' Motion (Rec. doc. 17) to Suppress Evidence. The United States of America (the "Government") opposes the motion. Rec. doc. 19. The Court conducted a suppression hearing on May 19, 2015. Rec. doc. 31. For the reasons stated herein, the Defendant Marcus Harris' Motion (Rec. doc. 17) to Suppress Evidence is **GRANTED**.

**Background**

The Court makes the following factual findings based on the evidence presented at the May 19, 2015, suppression hearing. On January 28, 2015, law enforcement officers conducted a rapid entry into the Defendant Marcus Harris' home located at 3347 Eleanor Street in an attempt to execute an arrest warrant for another individual. Rec. doc. 43, p. 5-7. The officers searched the residence and found Harris and a gun. Harris has been charged with violating 18 U.S.C. §922(g)(1), possession of a firearm by a convicted felon. Rec. doc. 1. Defendant filed this Motion to Suppress claiming the search of his residence was made without a warrant and is in violation of his Fourth Amendment rights. Rec. doc. 17.

In early January 2015, the United States Marshals Service Fugitive Task Force ("Task Force") joined with the Baton Rouge Police Department ("BRPD") to assist in the search for

1

Christopher Thornton ("Thornton").[1] Thornton was wanted on multiple arrest warrants issued earlier in January for violent felonies in which three people were injured. Rec. doc. 43, p. 8-11. BRPD searched for Thornton without success at the home address listed in the arrest warrants and the address listed on his driver's license. Neither BRPD nor the Task Force knew of a specific vehicle associated with Thornton during the relevant time period. Rec. doc. 43, p. 22.

The Task Force interviewed numerous individuals in an attempt to locate Thornton. Rec. doc. 43, p. 20. Most of these individuals indicated to officers that they did not know where Thornton was living. Rec. doc. 43, p. 20-21. The individuals interviewed were hesitant to give the officers information because they believed Thornton was crazy, carried a gun, and would kill them if they spoke to police. *Id.* The interviewees also indicated that Thornton was on the run, aware of the police manhunt, and willing to "shoot it out" with police to avoid jail. Rec. doc. 43, p. 21, 74.

The Task Force believed Thornton to be a member of a gang that operated in an area of Baton Rouge known as "The Park" and "Ghost Town." Rec. doc. 43, p. 12-13, 15. A minor ("U") told the Task Force that he knew Thornton and that Thornton was hiding from police with another minor ("V") at V's residence within Ghost Town. Rec. doc. 43, p. 25, 76. U believed Thornton was residing with V in Ghost Town because U had seen Thornton and V walking together in Ghost Town three days previously. *Id.* U also stated that Thornton was probably still with V, and if not, V would know where Thornton could be located. *Id.* By use of online mapping software, U identified 3347 Eleanor Street as the location where V lived. Rec. doc. 43, p. 26-27. The Task Force subsequently checked a law enforcement database that revealed K.C.

---

[1] This Court notes that the U.S. Marshals Service Fugitive Task Force and its allied groups play an essential role in law enforcement in this District and the tasks they undertake are fraught with danger. These men and women literally place their lives in danger on a daily basis to make this community a safer place in which to live. Just a few months ago a young member of this Task Force was killed performing his duties. Theirs is a job that deserves the thanks and respect of all of our citizens.

was the current resident of 3347 Eleanor Street. Rec. doc. 43, p. 29. The Task Force believed that K.C. was V's mother. Rec. doc. 43, p. 29. The Task Force did not attempt to interview either K.C. or V before making the forced entry.

Additionally, the Task Force received a tip from a confidential informant that Thornton and others had threatened to kill the informant's minor son because the son had provided information to the police. Rec. doc. 43, p. 30-31. One of the others alleged to have made the threat was another juvenile ("X"). *Id.* X was in the same gang as Thornton, was familiar with Thornton, and told the Task Force that Thornton was no longer in Louisiana but could be located in an adjoining state. Rec. doc. 43, p. 30-31, 57-58.

A Narcotics Detective with BRPD contacted the mother of the shooting victim described in one of Thornton's outstanding warrants. Rec. doc. 43, p. 34. The victim's mother told the officer that her acquaintances had seen Thornton in the area of "Ghost Town," which includes Eleanor Street. *Id.* At that point, the Task Force decided to go to 3347 Eleanor Street early on January 28, 2015, and conduct a rapid entry into the residence. *Id.*

Once the Task Force arrived at the home, members knocked on the door and announced themselves. Rec. doc. 43, p. 37. After a short waiting period, no one answered the door. Rec. doc. 43, p. 38. The Task Force attempted to forcibly enter through a front door, without success. Rec. doc. 43, p. 38-39. The Task Force then forcibly entered through a second front door. *Id.* Task Force members went throughout the house attempting to locate Thornton. Rec. doc. 43, p. 39-40, 81. Instead of finding Thornton, however, they located Harris hiding face-first underneath a bed with a gun nearby. *Id.* Officers read Harris his Miranda rights. Rec. doc. 43, p. 44. Harris told the officers he was sleeping on the front couch when he heard the Task Force arrive. Rec. doc. 43, p. 44-45. He ran and hid under the bed with his pistol because he was a

convicted felon and did not want to be caught with a firearm. *Id.* Thornton was subsequently arrested in Texas. Rec. doc. 43, p. 63.

**Analysis**

After reviewing the parties' motions and pre-hearing memorandums, it is apparent that there are three issues for review. First, whether the Task Force's entry into the residence was constitutionally permissible because of a reasonable belief that Thornton was residing at and presently within 3347 Eleanor Street. Second, whether the Task Force's actions were constitutionally permissible based on the exigent circumstances exception to the warrant requirement. Finally, whether the Task Force's seizure of the firearm satisfied the requirements of the plain view exception.

1. <u>Warrantless Entry into Third Party's Home</u>

Absent exigent circumstances or consent, the Fourth Amendment prohibits law enforcement from entering into an individual's home to make a felony arrest without a search or arrest warrant. *Payton v. New York*, 445 U.S. 573 (1980). The Government asserts that the arrest warrant issued for Thornton provided the Task Force with the authority to enter 3347 Eleanor Street.

The authority of law enforcement to enter into a home to execute a valid arrest warrant depends on whether the subject of the arrest warrant resides at and is presently within a particular residence. *See Steagald v. United States*, 451 U.S. 204 (1981). When entering the home of a third party—a party not the subject of the arrest warrant—the Fourth Amendment prohibits law enforcement agents from entering into the third party's residence without first obtaining a search warrant. *Steagald*, 452 U.S. at 217. However, a valid arrest warrant gives law enforcement the limited authority to enter a "dwelling in which the suspect lives when there is reason to believe

4

that the suspect is within." *Payton*, 445 U.S. at 602. The Fifth Circuit has held that the "reasonable belief" standard outlined in *Payton* is distinct from the probable cause standard that governs the initial issuance of the arrest warrant. *United States v. Route*, 104 F.3d 59, 62 (5th Cir. 1997). "'Reasonable belief' can only be ascertained through a weighing of the facts in the record, as it is a 'fluid concept[ ] that takes [its] substantive content from the particular contexts in which the standard[ ][is] being assessed.'" *United States v. Barrera*, 464 F.3d 496, 500 (5th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). Additionally, the Fifth Circuit has applied this reasonable belief standard to both the requirement that the subject reside at the address and that the subject is located within the premises. *Barrera*, 464 F.3d at 501-03.

In the present case, the Task Force possessed an arrest warrant for Thornton when they went to Harris' home. Therefore, the primary issue before the Court is whether law enforcement agents had "reason to believe" that Thornton, the subject of a valid arrest warrant, resided at and was presently within 3347 Eleanor Street. Based on the circumstances, the Court finds that the Task Force did not have a reasonable belief that the subject of the arrest warrant was residing at and located within 3347 Eleanor Street.

The Government argues that the Task Force reasonably believed Thornton was living at 3347 Eleanor Street because several individuals stated that Thornton was seen around Eleanor Street. The Government supports its position with two cases from the Fifth Circuit, *United States v. Route*, 104 F.3d 59 (5th Cir. 1997) and *United States v. Barrera*, 464 F.3d 496 (5th Cir. 2006). Additionally, the Government analogizes this case to a Tenth Circuit decision, *United States v. Denson*, 775 F.3d 1214 (10th Cir. 2014).

In *Route*, police entered Route's home based on an arrest warrant for a third party, Crossley. 104 F.3d at 61-62. Route moved to suppress the evidence in the house, arguing that

5

police did not have reason to believe Crossley resided at and was presently within the residence. *Id.* The arresting officer relied on Crossley's credit card applications, water and electricity bills, vehicle registration, and mailing address which all listed the particular residence that police searched. *Id.* at 62 n.1. The Fifth Circuit held that the arresting officer had performed sufficient due diligence in concluding that Crossley lived at the particular residence. *Id.* at 62-63.

In *Barrera*, an officer attempted to execute an arrest warrant for Jose Barrera, a drug trafficker known to carry a gun. 464 F.3d at 497. The officer went to the address provided by Jose's probation officer, but a visit to this location revealed Jose no longer lived there. *Id.* at 497. The officer then learned that Jose had been arrested at a specific address in Laredo, Texas, four months earlier, and provided the bail bondsman with the same address as his place of residence on the bond paperwork. *Id.* The Laredo police informed the officer that Jose was known to drive three specific vehicles, all three of which were located at the identified address. *Id.* at 497-98. When someone left the residence using one of the three vehicles, police conducted a traffic stop and determined that the driver was Jose's brother. *Id.* at 498. Police entered the residence, found a firearm, and charged the defendant with possession of a firearm by a convicted felon. *Id.* at 498-99. The Fifth Circuit determined that the officer's investigation provided him with a concrete reason to believe that Jose resided at and was within the particular residence, and the evidence did not support a belief that Jose was a mere guest at his brother's residence. *Id.* at 504.

The Government also relies on a Tenth Circuit case that found officers had a reasonable belief that the subject of an arrest warrant was residing at and presently within a residence. In *Denson*, the Court found five facts that, in combination, were sufficient to establish that the subject of an arrest warrant was residing at and presently within a particular location: (1) Denson

6

had recently opened a utility account at the relevant address; (2) police were unaware of any other address for Denson; (3) Denson had not reported any earnings, which suggested he was out of work and might be home during a workday; (4) Denson had absconded from probation and was hiding from law enforcement; and (5) the electric meter at the address was going faster than normal, suggesting someone was probably home. *United States v. Denson*, 775 F.3d 1214, 1217-18 (10th Cir. 2014).

In the present case, the Task Force lacked concrete evidence and insufficient corroboration that Thornton resided at 3347 Eleanor Street. The arrest warrants and Thornton's driver's license indicated that he resided at a different address than Eleanor Street. Unlike *Route* and *Denson*, there are no credit card applications, utility bills, vehicle registrations, or mailing address that would confirm that the person wanted in the arrest warrants lived at 3347 Eleanor Street. Unlike *Barrera*, Thornton had not previously been arrested at this particular residence, nor had he given this address as his place of residence to any third party that would indicate that he actually resided there. Moreover, the Task Force did not know what vehicles Thornton drove or that any such vehicles could be located near 3347 Eleanor Street. While persons on the run from police do not routinely establish utility bills in their name, in *Denson* the presence of a utility account combined with no knowledge of another address gave sufficient proof that the defendant resided at the particular home in question. Unlike *Denson*, there are no utility accounts and the Task Force officers or other law enforcement personnel had followed tips to no less than five other residences, thus raising serious doubts as to a reasonable belief that Thornton resided in any one particular location.

The information received from interviewees fails to establish that the Task Force had a reasonable belief Thornton resided at 3347 Eleanor Street. Most of the individuals the Task

Force interviewed told officers they did not know where Thornton was living. In the interview with X, X indicated that Thornton was no longer in Louisiana. The Task Force entered the home based primarily on third-hand information from the associates of a shooting victim's mother who claimed they saw Thornton walking in a general area of the city.

Finally, the Task Force knew that K.C. was the currently listed resident on the law enforcement database, that V lived inside the home, and that V would know Thornton's current location. However, the Task Force did not contact K.C. or V to corroborate the information received from other sources prior to making the forced entry. Considering the lack of concrete evidence and insufficient corroboration to establish that Thornton associated himself with this particular address, the Court finds that the Task Force did not conduct sufficient due diligence to establish a reasonable belief that Thornton resided at and was presently within 3347 Eleanor Street. Therefore, the entry into 3347 Eleanor Street was not constitutionally permissible by virtue of the arrest warrant issued for Thornton.

2. Exigent Circumstances

The Government contends the Task Force's entry into 3347 Eleanor Street was justified pursuant to the exigent circumstances exception to the warrant requirement. A warrantless entry will survive constitutional scrutiny if exigent circumstances exist to justify the intrusion. *United States v. Rico*, 51 F.3d 495, 500-01 (5th Cir. 1995). Exigent circumstances include those in which officers reasonably fear for their safety or the safety of others, where firearms are present, or where there is a risk of a criminal suspects escaping or fear of destruction of evidence. *United States v. Hicks*, 389 F.3d 514, 527 (5th Cir. 2004). The Fifth Circuit has also held that the gravity of the underlying offense for which the arrest is being made is a factor in determining whether exigent circumstances existed. *Id.* at 527-28.

8

The Government claims *Hicks* roughly parallels the dilemma found in this case—a warrantless entry of a violent suspect's residence for the purpose of arrest. *Id.* at 526-28. In *Hicks*, a police SWAT team entered the home of a suspect and arrested him without a warrant. *Id.* at 527. At the time, the police believed that the suspect had recently shot and killed a fellow police officer. *Id.* The Government claims the Task Force faced a similarly grave situation as the officers in Hicks. The Task Force was seeking to arrest Thornton, an individual with gang ties, who had injured at least three people. Additionally, the Task Force had received a complaint from the mother of a victim stating Thornton had threatened her child. Other individuals reported Thornton was on the run, aware of the police manhunt, likely armed, and willing to "shoot it out" with police to avoid jail. Therefore, the Government claims exigent circumstances existed in this case.

While the violent offenses for which Thornton's arrest warrants were issued are no doubt serious, the Court is not persuaded that exigent circumstances existed. Unlike *Hicks*, Thornton was not suspected of previously acting violently toward police. The Government's argument that there was a danger posed to the Task Force's safety or the safety of others is premised upon Thornton being within or reasonably believed to be within the premises. However, as discussed above, the Task Force did not reasonably believe that Thornton resided at and was presently within 3347 Eleanor Street. Furthermore, the Task Force did not observe or hear any activity within the house which would lead them to believe that contraband was inside or that an illegal act was taking place. Accordingly, the Task Force's entry into the home is not valid pursuant to the exigent circumstances doctrine. Therefore, the Court finds that the Task Force's entry into 3347 Eleanor Street violated the Fourth Amendment.

3. <u>Plain View Exception</u>

Finally, the Government argues that the seizure of the gun found near Harris is constitutionally permissible under the plain view exception to the warrant requirement. The Fifth Circuit has held that the plain view exception to a warrantless seizure allows police to seize items "where: (1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was immediately apparent; and (4) the police had lawful right of access to the item." *United States v. Roberts*, 612 F.3d 306, 312 (5th Cir. 2010) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)).

The firearm recovered was located within feet of Harris while the Task Force conducted a protective sweep of the residence. However, as discussed above, the Task Force entered the residence on Eleanor Street in violation of the Fourth Amendment. Accordingly, the Task Force did not lawfully enter the area where the firearm was located. Therefore, the plain view exception does not apply, and any evidence seized and any statements made during the search of the home on January 28, 2015, must be suppressed, as the warrantless search of the third party's home violated the Fourth Amendment.

## Conclusion

Therefore, the Court **GRANTS** the Defendant Marcus Harris' (Rec. doc. 17) to Suppress Evidence.

Signed in Baton Rouge, Louisiana, on August 19, 2015.

_____
JUDGE JAMES J. BRADY
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA